IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA § | | |
| § | CIVIL ACTION No. 1:14-cr-1 | |
| v. § | | |
| § | JUDGE RON CLARK | |
| DEVIN WAYNE McCRANEY, and § | | |
| SHARIKA BAKSH ALLISON § | | |
| § | | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA § | | |
| § | CIVIL ACTION No. 1:14-cr-80 | |
| v. § | | |
| § | JUDGE RON CLARK | |
| DARYL GLENN JOHNSON, § | | |
| ERIN GIPSON JOHNSON, and § | | |
| KAILYN DeSHONDRA PETE § | | |
| § | | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, § | | |
| § | CIVIL ACTION No. 1:14-cr-93 | |
| v. § | | |
| § | JUDGE MARCIA A. CRONE | |
| WILLIAM ELZY KELLEY, JR. § | | |
| § | | |

## MEMORANDUM ORDER REQUIRING UNSEALING OF DOCUMENTS

Six Defendants pled guilty to crimes committed in connection with their association with the Beaumont Independent School District ("BISD"). Before the court is a request to unseal the Factual Basis and Stipulation[1] contained in the files of three Defendants and to unseal the Plea Agreements of all six Defendants. The court has considered the evidence and arguments and holds that: (1) each Factual Basis shall be unsealed; (2) disclosure of information that would allow identification of defendants who agree to cooperate in exchange for an opportunity to

---

[1] Also referred to as the "Factual Basis," this is a statement of the facts that establish the essential elements of the offense. By his signature, the defendant stipulates to those facts.

1

receive a downward departure poses a substantial risk to those defendants and to others, and there is an overriding interest in preventing the disclosure of that information, so that information shall remain sealed; and (3) all other information in the plea agreements shall be unsealed.

## I. BACKGROUND

After a lengthy and heavily publicized investigation into allegations of misallocation and misappropriation of funds by administrators, employees, and volunteers of BISD, five Defendants pled guilty to fraud or conspiracy to commit fraud upon programs receiving federal funds, and one Defendant pled guilty to wire fraud. After the Defendants signed their plea agreements, each plea agreement was filed under seal. Additionally, the Factual Bases of three Defendants were filed under seal.

A reporter for a local newspaper asked a deputy in the Clerk's Office for copies of these documents and was informed that they were sealed. An attorney for the newspaper wrote to the court asking that they be unsealed. The cases had been assigned under the random selection plan of the District to the undersigned and to the Honorable Marcia A. Crone, United States District Judge. Some of the pleas had been taken by different Magistrate Judges. With the agreement of Judge Crone, the undersigned *sua sponte* set a hearing to determine whether all or a part of the documents should be unsealed. Notice was provided to the United States Attorney's Office, the Office of the Public Defender, counsel for the five Defendants not represented by the Public Defender, and counsel for the newspaper, who submitted an extensive letter brief. All participated in the hearing, except for counsel for Defendant Allison, who neither appeared nor

contacted the court with a reason for his absence.[2] The Court allowed another local media outlet to file an amicus brief in support of unsealing the information.

Three witnesses testified at the hearing and cross-examination was allowed. The Government, defense counsel who were present, and counsel for the newspaper, stated their respective positions and arguments.

## II. DISCUSSION

A.  **With Narrowly Drawn Exceptions, the Law Favors Public Access to Judicial Records.**

The public has a common-law and First Amendment right to inspect and copy judicial records. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980); *Nixon v. Warner Comm'ns, Inc.*, 435 U.S. 589, 597 (1978). The public's access to judicial records "serves to promote trustworthiness of the judicial process, to curb judicial abuses, and to provide the public with a more complete understanding of the judicial system, including a better perception of its fairness." *S.E.C. v. Van Waeyenberghe*, 990 F.2d 845, 849 (5th Cir. 1993) (internal citations and quotations omitted). First Amendment access is rooted in transparency. *See Richmond Newspapers*, 448 U.S. at 572 ("People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing."). The right of access extends to all phases and records of criminal proceedings. *Id.* at 580 (noting the public right of access to trials); *Press-Enter. v. Superior Court of Cal.*, 464 U.S. 501, 508 (1984) (*Press-Enterprise I*) (noting the public right of access to voir dire); *Waller v. Georgia*, 467 U.S. 39 (1984) (noting the public right of access to suppression hearings); *Press-Enter. v. Superior*

---

[2] Counsel for Defendant, was notified by a standard "Notice of Hearing" through the electronic CM-ECF system and also by email from the court's judicial assistant. There was no return notice that the email was not deliverable or not properly addressed and no contact from counsel stating a reason for his absence.

*Court of Cal. for Cnty. of Riverside*, *(Press-Enterprise II)*, 478 U.S. 1 (1986) (noting the public right of access to preliminary hearings).

The First Amendment right of public access is a very strong presumption; it is not an absolute rule. *See, e.g.*, *Press-Enterprise I*, 464 U.S. at 508. The presumption of openness may be overcome by an overriding interest based on findings that sealing is essential to preserve higher values and is narrowly tailored to serve that interest. *Id.* at 510.

Courts have delineated narrow circumstances in which an overriding privacy interest outweighs the presumption of public access to judicial records. *See, e.g.*, *id.* at 511 (noting that the jury selection process sometimes gives rise to a compelling interest of a prospective juror when interrogation touches on deeply personal matters that the person has legitimate reasons for keeping out of the public eye).

Similarly, courts have noted safety concerns as overriding interests that outweigh the presumption of public access to judicial records. *See, e.g.*, *Presley v. Georgia*, 130 S.Ct. 721, 725 (2010) (noting that there are circumstances where a judge could conclude that threats of improper communications with jurors or safety concerns are concrete enough to warrant closing voir dire); *United States v. Haller*, 837 F.2d 84, 85-89 (2d Cir. 1988) (holding that it was improper to seal an entire plea agreement but proper to redact one paragraph with cooperation language to ensure the safety of a defendant who had agreed to testify before a grand jury). Before sealing judicial records, a court must identify the interest that overrides the public's right to an open court, and articulate supporting findings specific enough that a reviewing court can determine whether the order was properly entered. *See Press-Enterprise I*, 464 U.S. at 510.

B.   **Disclosing the Identity of Informants Endangers the Safety and Lives of Informants and Officers.**

At the hearing, Mr. Malcolm Bales, United States Attorney for the Eastern District of Texas, presented three witnesses in support of its argument that certain information should remain sealed to protect cooperating defendants, their families, prison staff, and Government officials: (1) Anthony Garrow of Washington, D.C., Supervisory Intelligence Officer for the Bureau of Prisons; (2) Lieutenant Robert Carrasco of Beaumont, Texas, a Special Investigator at the Federal Correctional Complex; and (3) Joseph Batte of Beaumont, Texas, an Assistant United States Attorney in the Eastern District of Texas. Cumulatively, the witnesses have sixty-four years of experience with cooperating defendants.

Mr. Garrow has worked for the Bureau of Prisons for twenty-two years. He began working as a correctional officer in a United States penitentiary in California and worked his way up to the Intelligence Section. He worked in two different federal penitentiaries before transferring to Washington, D.C., where he currently works in the National Gang Intelligence Center at the Bureau of Prisons Central Office. The National Gang Intelligence Center is a nationwide task force led by the FBI which targets gang activity across the country. Mr. Garrow's investigative work with the Center focuses on criminals or gang leaders who control street criminal activity from inside the prison. In his position, Mr. Garrow has access to large amounts of information from several federal penitentiaries.

Lt. Carrasco has worked for the Bureau of Prisons as a Special Investigator for sixteen years. He investigates prison staff, protective custody cases, inmate threats, and inmate assaults. As part of his investigations, Lt. Carrasco interviews inmates who have witnessed crimes and who are suspected of having committed crimes. In investigating approximately five hundred inmate assaults, Lt. Carrasco has gained extensive knowledge about prison gang culture,

specifically how the prison gangs handle new inmates and how the gangs determine whether they favor or disfavor a new inmate.

Mr. Batte has been an Assistant United States Attorney ("AUSA") for twenty years. Before serving as an AUSA, Mr. Batte was a state prosecutor for six years in Beaumont. As AUSA, he represented the Government in seven capital murder cases in the Eastern District of Texas. In preparing for these cases, Mr. Batte spoke with dozens of witnesses and potential witnesses. Through these conversations, Mr. Batte gained extensive knowledge about prison culture, specifically how inmates react to cooperating defendants, informants, "snitches," and even inmates who are merely suspected of being cooperators.

For several hours, these three witnesses described specific cases in which disclosure of the identity of an informant, and even disclosure that an inmate had relayed any information at all to prison officials, resulted in retaliation in the form of realistic and believable threats of violence, actual violence, and death. Each of these witnesses have years of experience which make them well-qualified to provide such evidence. Their testimony was directly on point and specific. The court finds that their testimony, as set out in the record and summarized below, is highly credible.

Mr. Garrow testified about the dangers that cooperating inmates face, regardless of whom they have cooperated against. In one of Mr. Garrow's many examples, an inmate told prison staff that three inmates from the Missouri car[3] told him he had to check in[4] for being a rat[5] and

---

[3] A "car" is a group of inmates from a certain geographical location or a group of inmates who share a common characteristic, such as race or membership in the same gang.

[4] A new inmate "checks in" when members of a car demand that he show them his Presentence Investigation Report (PSI) sometimes referred to as a Presentence Report (PSR), so that they can verify that he has not cooperated against anyone. A car may also require a new inmate to obtain a copy of his plea agreement.

6

leave the compound or the other inmates would kill him. He also recounted how another inmate broke into his cellmate's locker to steal a copy of his cellmate's PSI. The inmate read his cellmate's PSI and discovered that his cellmate had provided substantial assistance to the Government. The inmate accosted his cellmate in the chow hall and told him that if he did not leave the compound, he would kill him.

Mr. Garrow explained that cooperating inmates are often "pushed" off prison compounds by their fellow inmates. Mr. Garrow described the case of an inmate approaching prison staff without shoes. When the staff asked the inmate why he was not wearing shoes, the inmate stated that other inmates had discovered he was a cooperator, robbed him of his shoes, and told him to leave the compound.

Mr. Garrow testified about an inmate who was assaulted after being identified as a cooperator in the *Quad-City Times*, a newspaper in Davenport, Iowa. Mr. Garrow explained that inmates often write to friends and family members who are not incarcerated and ask them to research other inmates on LexisNexis, Google, or Pacer to determine whether they provided substantial assistance to the Government.

He further explained that the advent of smart phones has made it much easier for inmates to identify cooperators. Although cellular phones are contraband in federal penitentiaries, Mr. Garrow described inmates finding ways to sneak them into prisons and using them to access the internet to research potential cooperators. Analysis of confiscated phones revealed that inmates used a cell phone to research a leader of Los Zetas—a Mexican drug cartel—on Wikipedia. The inmates then performed an inmate search on the Bureau of Prisons website to determine in which penitentiary the leader was incarcerated.

---

[5] A "rat" is an inmate who has cooperated with or assisted the Government in gathering enough evidence to charge someone else with a crime.

Another inmate created a webpage while in prison, on which he posted an FBI 302 form which identified a cooperating defendant.[6] The inmate wanted other inmates to locate the cooperating defendant in their prison and assault him. Similarly, Mr. Garrow testified that two specific inmates—Maynard Campbell and Anthony Campbell—were murdered after their fellow inmates identified them as cooperators.

Mr. Batte described another inmate homicide case in detail—the Barnes case. In that case, Barnes and three others robbed a drug dealer in Washington, D.C. Barnes and one individual waited in the living room of the drug dealer's apartment while the two others entered the drug dealer's bedroom, robbed him, and ultimately executed him. Barnes cooperated with the Government. He testified twice in Washington, D.C.—once in one of his accomplice's trial, and once in the remaining two accomplices' trial. Two of his accomplices were convicted and sent to a federal penitentiary. At Barnes's sentencing, the United States Attorney's Office for the District of Columbia filed a 5K1 Motion on behalf of Barnes, recommending that the court view Barnes's substantial assistance with favor. The judge denied the motion and sentenced Barnes to sixty years in prison. The United States Attorney's Office for the District of Columbia did not take any further steps to ensure Barnes's protection. Barnes was sentenced to a federal penitentiary, where he was shuffled from compound to compound due to frequent assaults or being chased off the yard by D.C. cars. Ultimately, Barnes was transferred to the Beaumont penitentiary, where he informed prison staff of his history of assaults and threats. Prison staff

---

[6] The FBI uses FBI 302 forms to take notes during interviews and debriefings of cooperating defendants and informants. *See generally United States v. Kohring*, 637 F.3d 895, 906-910 (9th Cir. 2010).

offered Barnes housing in the Special Housing Unit, but Barnes chose to take his chances on the yard.[7]

An inmate named Joseph Ebron, the former cellmate of one of Barnes's co-defendants, was transferred to the Beaumont penitentiary shortly before Barnes. Before his transfer, Ebron's cellmate told Ebron to be on the look-out for Barnes. Ebron found Barnes, and he and another inmate stabbed Barnes 104 times, resulting in his death.

Each witness stressed that in protecting cooperating defendants, uniformity in treatment of prisoners is a key to protecting those cooperators. Mr. Garrow explained that during an investigation involving numerous witness interviews, he conducts every interview in the same manner to ensure uniformity. This is known as a "mass interview." For example, he may schedule every inmate interview to last three minutes. One inmate might enter the interview room and say nothing for the three minutes. When that inmate exits, a second inmate might enter the interview room and explain everything that happened leading up to the crime under investigation. Nevertheless, Mr. Garrow will ask that inmate to leave when three minutes have elapsed. By treating each inmate in the same way, Mr. Garrow curbs suspicion regarding who has, and has not, offered information during their inmate interview.

However, these precautions are not always enough. Mr. Batte testified about an organized assault on cooperators in the Eastern District, referred to by inmates as "March Madness," because it occurred during the NCAA basketball tournament. Mr. Batte described a rule among inmates that when questioned during a mass interview, an inmate should state only his name and that he had no information. Ellis Joseph Mosier, an inmate at the Federal

---

[7] An inmate is normally confined to the Special Housing Unit or "SHU" as a punishment. The inmate has no access to classes or general outdoor recreation and is not eligible to receive the "good time credit" that can be earned by inmates on the yard. Thus, any "protection" that the SHU provides comes with severe drawbacks.

9

Correctional Complex in Beaumont, stabbed an inmate to death, which lead to a prison lockdown so that prison officials could conduct a mass interview. Thirty to forty inmates provided information in their interviews—some of which was incriminating and some of which was exculpatory.

The notes of those interviews were provided to the attorneys representing Mosier. Even though Mosier was housed in the SHU, Mosier obtained and then forwarded information from the interview notes to the "shot-callers," or leaders, of the various cars in the prison. During a regular movement of prisoners, the shot-callers coordinated simultaneous assaults on all inmates who broke the "I know nothing" rule. Inmates who gave incriminating information, as well as inmates who gave exculpatory information, were assaulted. There were so many simultaneous assaults that the prison staff was unable to react effectively.

Lt. Carrasco testified that at the Beaumont Penitentiary, inmates identified as cooperators are extorted for money, commissary, sex, and to assault other inmates. The witnesses testified that when cars are unable to determine whether a new inmate is a cooperator, the inmate may be required to "pays his dues" by assaulting another inmate of the car's choice, sometimes an inmate whom the car has identified as a "snitch." Or the inmate may be ordered to attack a guard. In this way, the car can be sure of the new inmate's loyalty. Lt. Carrasco testified that he had investigated about five hundred prison assaults, and that two hundred seventy-five to three hundred occurred as a result of inmates identifying their victims as cooperators or potential cooperators.

Aside from the inmates' proficiency with technology and their proclivity for accessing contraband smart phones, Mr. Garrow explained that inmates are very familiar with sentencing documents and plea agreements from their own personal experience in the judicial system. This

allows them to spot any difference between their own documents and those of a potential cooperator. Mr. Garrow testified about an inmate who had asked his mother to retype his PSI to remove any reference of him cooperating with or providing assistance to the Government. In doing so, his mother typed the wrong date on the altered PSI. The other inmates discovered the typographical error, realized that the PSI was forged, and used it against him.

As Lt. Carrasco explained, when inmates assault someone whom they have identified as a cooperator, it is dangerous for both the inmates and the officers. When prison staff responds to an inmate assault, the staff risks injury, and inmate assaults have resulted in numerous injuries to staff. According to Lt. Carrasco, merely moving an inmate to the SHU does not eliminate the threat to an inmate. If a threatened inmate who is moved to the SHU "owes a debt" to a certain group in prison, that group will then expect that inmate's car to fulfill the debt. This could potentially lead to even more assaults. Another inmate in the SHU may work off his debt by assaulting the inmate in the SHU. Moreover, after being housed in a special unit for protective custody, that inmate is forever deemed as "weak," leading to more altercations in the prison.

The court also heard testimony that stories and rumors of inmate assaults deter defendants from cooperating with the Government in future cases. As Mr. Batte explained, "in the federal system, cooperation is, in a way, the life blood of our prosecutions." The witnesses testified that the first question potential cooperators ask is, "How will the Government protect me?" If the Government is unable to credibly ensure a potential cooperator's safety, the Government will be deprived of its key witnesses in many prosecutions. This was confirmed by Mr. Evans, one of the attorneys at the hearing.

Additionally, the attorneys representing Defendants related their concerns about the dangers in identifying cooperators, based upon their experience in defending individuals. Mr.

McElroy, who has years of experience as an Assistant Public Defender, stated that there is a sophisticated inmate network to find cooperators and seek retribution against them, inside and outside the prison system, concluding: "So, just because somebody doesn't go to prison doesn't mean that they can't be retaliated or won't be retaliated." Mr. McElroy also expressed concern about the difficulty in protecting inmates in an electronic age with the great volume of information about defendants that is before the court. Mr. Simmons, another Defendant's attorney, related how one of his former clients, who was out on bond, was tortured, shot, and burned after there were "hints that he was cooperating."

**C. Analysis**

Based on this extensive and credible testimony, the court finds that allowing the disclosure of information in plea agreements that identifies defendants who have assisted the Government by cooperating against others, or who agree to do so in the future, puts those defendants at risk of extortion, injury, and death. The court finds that disclosure of such information likewise puts the defendants' family members at risk.

The court also finds that such disclosures are very likely to endanger prison staff, and deputy marshals involved in transporting prisoners, as these officials have a duty to intervene when an inmate assaults a suspected cooperator. Such no-holds-barred altercations are not the cleanly choreographed affairs of the movies or the regulated and refereed matches of the dojo. It matters little to the guard who is punched, sapped with a "lock-in-a-sock," or stabbed with a "shank," that the intended victim was a prisoner. Finally, the court finds that a policy permitting

disclosure of information in plea agreements which identifies defendants as cooperators is likely to jeopardize continuing criminal investigations.[8]

Accordingly, the Court finds that there is an overriding interest in preventing disclosure of information that states or even hints that a defendant has agreed to be an informant or cooperating witness. This does not end the analysis. The court must narrowly tailor any restriction on the public's right to open court proceedings and documents.

At the hearing, the Government asserted that in the cases before the court, none of the information in any Defendant's Factual Basis was likely to endanger any Defendant, and that there was no reason that they should not be unsealed. Counsel for Defendants agreed. Upon review of the documents and consideration of the testimony and legal arguments, the Court finds that each Defendant's Factual Basis (in some cases titled "Factual Basis and Stipulation") shall be unsealed.

Likewise, most of the language in plea agreements does not indicate cooperation on the part of any defendant but merely states basic information such as the crime to which the defendant is pleading, the defendant's acknowledgement of rights he is waiving, the defendant's acknowledgement of the statutory and guideline range of punishment, and except in the case of an 1l(c)(1)(C) agreement, the defendant's acknowledgment of the fact that sentencing within the statutory range is within the discretion of the court. There is no good reason that this language should be sealed.

---

[8] While a defendant has a constitutional right to confront those who testify against him, a defendant has no constitutional right to confront a witness who has merely agreed to cooperate with the Government, before any evidence is offered. *See, e.g.*, *United States v. Burden*, 600 F.3d 204, 223-225 (2d Cir. 2010) (noting that statements that the declarant intends for use at trial are testimonial in nature and holding that statements made by a people speaking to a confidential informant wearing a wire are not testimonial in nature because those people did not intend for the statements to be used at trial); *United States v. Stevens*, 778 F. Supp. 2d 683, 691 (explaining that only statements that are testimonial in nature violate the Confrontation Clause).

However, as noted above, occasionally, a defendant may agree to cooperate in exchange for a motion by the Government for a downward departure under United States Sentencing Guidelines § 5K1.1 or in exchange for the promise of future consideration of a Rule 35(b) motion for downward departure. Fed. R. Crim. P. 35(b). As the court has found, release of this information poses substantial risks to the cooperating defendant and others, and that risk justifies sealing such information. *See* Fed. R. Crim. P. 32(d)(3) (stating that presentence reports "must exclude . . . any other information that, if disclosed, might result in physical or other harm to the defendant or others.")

Unsealing only those plea agreements that do not contain cooperating language would paint a bulls-eye on every defendant whose plea agreement was not unsealed. Likewise, the blank spaces left by redaction of cooperation clauses from plea agreements would simply identify those whom the prison gangs needed to "discipline" or kill.

**D.    Procedure to Seal Certain Information in Plea Agreements**

Taking guidance from local rules of other districts around the country, Local Criminal Rule CR-49 now provides that all plea agreements will be unsealed once they are accepted by the court. However each plea agreement will include an addendum that will either state that no additional information is included or will set out the agreement concerning consideration for a downward departure under § 5K1.1 or Rule 35(b) in exchange for cooperation.[9] *See* E.D. Tex.

---

[9] *See, e.g.*, N.D. Tex. Judicial Conf. Policy on Privacy and Public Access to Electronic Case Files (March 2008) (ordering that sealed documents such as motions for downward departure for substantial assistance and plea agreements indicating cooperation shall not be included in public case files and shall not be made available to the public at the courthouse or via remote electronic access); N.D. Tex. G.O. 19-1 (July 2008) (ordering the Clerk of Court to ensure that there is no public access to plea agreement supplements, motions filed for downward departure, or motions filed for reduction of sentence); D. Md. S.O. 2012-10 (November 2012) (ordering that sealed supplements to plea agreements may not be provided to defendants or former defendants for their private review and/or retention); D. Vt. G.O. 71 (May 2014)

G.O. 15-11, *amending* E.D. Tex. G.O. 15-5, E.D. Tex. G.O. 93-3, *and* E.D. Tex. G.O. 93-4. That addendum will remain sealed. The six Plea Agreements now before the court were signed before the amendment of Local Criminal Rule CR-49, but the new amendments will provide public access to future factual bases and plea agreements, except for the very limited exception of information concerning whether a defendant has agreed to cooperate.

The court rejects the argument that some or all addenda should be unsealed after sentencing. Based on evidence provided at the hearing, the court finds that the reach of criminal gangs extends beyond the prison walls and that gangs seek revenge even after prisoners are released. The court also finds that holding a hearing in every case to determine whether to seal a defendant's addendum is not practicable. Between September 2013 and September 2014, the Eastern District of Texas terminated 804 criminal cases.[10] *See* U.S. Courts Fifth Judicial Circuit, Overall Report of District Judge Activity for the Twelve Month Period of October 1, 2013 through September 30, 2014. In almost all of those cases the defendant was sentenced. Holding so many hearings would be a substantial burden. Moreover, sealing the few addenda with a cooperation clause, while leaving the majority of addenda unsealed, would eviscerate the protection that Local Rule CR-49's uniform sealing requirement now provides.

---

(ordering portions of sentencing transcripts containing cooperation language sealed because the need to protect the safety of the defendant or others substantially outweighs the public's interest in accessing the transcript).

[10] The Southern District of Texas terminated 4,762 criminal defendants, and the Western District terminated 5,547 criminal defendants in the same time period. U.S. Courts Fifth Judicial Circuit, Overall Report of District Judge Activity for the Twelve Month Period of October 1, 2013 through September 30, 2014.

15

## III. Conclusion

Based on the findings set out above and the evidence presented, the court finds that:

**(1)** There is an overriding interest in sealing the language in plea agreements that identifies cooperators in such a way that the public has access to the remainder of the plea agreement and that it is not possible to determine from the part that is unsealed whether that defendant has agreed to cooperate; and

**(2)** The procedure to seal such information in the recent amendment to Local Criminal Rule CR-49, and as adapted to the Plea Agreements at issue in this case as set out below, balances the public's right of access against the higher need to protect the lives and safety of defendants, law enforcement personnel involved in guarding incarcerated defendants, and the family members of both defendants and law enforcement personnel, and the need to encourage accused individuals to provide the truthful information that is crucial to the successful prosecution of serious offenses.

As to the files of Defendants now before the court, it is **ORDERED** as follows:

**(1)** **Defendants McCraney and Allison:** Defendants Devin Wayne McCraney and Sharika Baksh Allison have already been sentenced and are incarcerated. The Government **SHALL** re-type the paragraphs in Defendants Devin Wayne McCraney's and Sharika Baksh Allison's plea agreements, without paragraph numbers, and in the unlikely event that any paragraph referencing cooperation in exchange for a sentencing consideration exists, that language shall be omitted without a blank or any other indication that matter has been deleted. These re-typed plea agreements **SHALL** then be filed, unsealed.[11] The Factual Basis and Stipulation of Kailyn DeShondra Pete (1:14-cr-80(3), Dkt. # 51) **SHALL** be unsealed.

**(2)** **Defendants Daryl and Erin Johnson, Pete, and Kelley:** Defendants Daryl Glenn Johnson, Erin Gipson Johnson, Kailyn DeShondra Pete, and William Elzy Kelley Jr. have not been sentenced. With the agreement of those Defendants and their counsel, their plea agreements **SHALL** be withdrawn and shall remain sealed. New agreements **SHALL** be prepared in accordance with the provisions of the recently amended Local Rule CR-49. After the new plea agreements are accepted by the court, they **SHALL NOT** be sealed;

---

[11] This ruling is not an indication that any such language exists. The court wants to make it very clear that it will not accept any request by, or agreement from, these Defendants or any other Defendant who is already sentenced, to simply unseal that Defendant's plea agreement as it now exists. As the witnesses testified, criminal gangs in the prison go to great lengths to obtain such information. If the plea agreements of Defendants that do not have such a clause are unsealed, all other Defendants will be targeted.

however, the addendum in each case **SHALL** be sealed. The Factual Basis and Stipulation of Daryl Glenn Johnson (1:14-cr-80(1), Dkt. # 43) and of Erin Gipson Johnson (1:14-cr-80(2), Dkt. # 47) **SHALL** be unsealed.

So **ORDERED** and **SIGNED** this **13** day of **April, 2015.**

_____
Ron Clark, United States District Judge